[No. 36913.    En Banc.    December 10, 1964.]

FERDINAND C. SCHNEIDER *et al.*, *Respondents*, v. YAKIMA COUNTY, *Appellant.**

*Lincoln E. Shropshire* and *Fred L. Stewart*, for appellant.

*Reported in 397 P. (2d) 411.

*Tonkoff, Holst & Hopp,* by *William B. Holst, Nashem & Prediletto,* by *Norman R. Nashem, Jr.,* and *George H. Mullins,* for respondents.

HILL, J.—An automobile, leaving a county road on a curve at the top of a steep declivity, went out into space and hurtled downward 83 feet to its first landing, and then continued downward to an ultimate landing 120 feet below the road. One occupant of the car was killed, and others were seriously injured.

The occupants were five boys, 16 or 17 years of age. The father of the boy who was killed brought a wrongful death action. Individual actions on behalf of each of three other boys, who were injured, were brought by their respective fathers as their guardians ad litem.[1] The defendant in each action was Yakima County (hereinafter called the County).

The actions were consolidated for trial, and the jury brought in a verdict for each plaintiff. From the judgments entered on these verdicts, the County appeals.

Thomas Cantwell, who did all the driving, borrowed his brother's new 1959 Pontiac Catalina automobile (referred to by Wayne Manuel as a "hot rod") to take the other four boys for a ride. With him in the front seat were Wayne Manuel and Richard McVey; in the back seat were Ferdinand Schneider, Jr., and John Hoffman. They proceeded west on Summitview Avenue to Mize Road, thence south on Mize Road to Tieton Drive, thence west on Tieton Drive to the place of the accident. Along the way, they decided to test the car's speed and it reached 105 miles per hour. (The testimony of Wayne Manuel is that he was not sure whether this speed was reached on Summitview Avenue or Tieton Drive. The testimony of Richard McVey is positive that it was on Summitview Avenue.)

A drawing, showing the curve on which the accident occurred, appears on page 354 and will serve to make clear the situation as one proceeds west on Tieton Drive approaching that curve.

---

[1] No action was brought on behalf of the fifth occupant of the car, who was the driver.

The road, as it curves sharply to the north, dips somewhat steeply (a 7.9 per cent grade) and then curves again to the southwest, climbing more gradually until it is again an east-west straight-away and, seemingly, in line with Tieton Drive east of the curve. The testimony is that a driver, traveling west, receives the impression that he is approaching a dip in Tieton Drive, rather than a curve, and that he sees Tieton Drive some distance ahead of him as though on the other side of the dip. This testimony is confirmed by the pictures in evidence.

Approaching from the east, the first sign of significance in this case was an intersection sign (see A on page 354). It was 444 feet east of the curve and 354 feet east of Mahre Road and was intended to direct attention to the intersection with Mahre Road, which comes in from the right.

Next is a reverse curve sign (see B on page 354), 310 feet east of the curve and 220 feet east of Mahre Road, intended to direct attention to the curve with which we are concerned.

There were no advisory speed signs and no "slow" signs or other warnings that speed should be reduced for the curve. The legal speed limit on Tieton Drive was 60 miles per hour. There is evidence that any speed in excess of 35 miles an hour was dangerous for westbound traffic on this curve.

The testimony as to the speed at which Cantwell was driving, when he entered this curve, varied from 55 to 70 miles an hour—based on in-court and out-of-court statements made by the occupants of the car. An engineer computed, from the physical facts, that the car's speed when it left the road was 48.78 miles per hour.

Other facts and other testimony will be referred to as we consider the specific assignments of error.

The County urges that the trial court erred in instructing the jury that the County was negligent, as a matter of law, in failing to perform its duty

". . . to erect and maintain warning and other signs as to color, design, erection and location in accordance with the uniform standards adopted by the State Highway Commission. . . ." (Instruction No. 10)

Instruction No. 19 told the jury that the County had the duty to exercise reasonable care to see that its roads and highways were maintained in a safe condition for ordinary travel, and that included the duty to give adequate warning of dangerous conditions in the highway. No error was assigned to this instruction.

The jury could conclude that there existed a dangerous condition and that reasonable care required an adequate warning. That the County had reached that conclusion is indicated by its placement of the two warning signs to which we have referred.

In considering this assignment of error, we are not concerned with any statutory duty of the County to place warning signs in the first instance, but with its duty (it having determined that markings are necessary) to conform with the

". . . uniform state standard of color, design, erection and location adopted and designed by the Washington state highway commission. . . ." RCW 36.86.040[2]

The necessity for a requirement of uniformity in color, design, manner of erection and location in a state having 39 counties seems obvious.

It was admitted by the county engineer that the signs placed by the County did not conform to certain standards adopted by the state highway commission, i.e., that the curve was on a radius that required a reverse turn sign (see C on page 354) rather than a reverse curve sign, and the minimum distance for such a turn sign is 350 feet from

---

[2]"The board [county commissioners] shall erect and maintain upon the county roads such suitable and proper signs, signals, signboards, and guideposts and appropriate stop, caution, warning, restrictive, and directional signs and markings *as it deems necessary* or *as may be required by law. All such markings* shall be in accordance with the uniform state standard of color, design, erection and location adopted and designed by the Washington state highway commission. In respect to existing and future railroad grade crossings over county roads the board shall be required to install and maintain standard, nonmechanical railroad *approach warning signs on both sides of the railroad* upon the approaches of the county road. All such signs shall be located a sufficient distance from the crossing to give adequate warning to persons traveling on county roads." RCW 36.86.040 (Italics ours.)

the beginning of the turn; and the sign which was erected was only 310 feet from the beginning of the turn.

This warranted the instruction that the County was negligent, as a matter of law, for its failure to conform to the uniform state standards.

The County's principal contention is that its failure to conform to state standards, and its other negligence if any, was not a proximate cause of the injuries sustained by the plaintiffs.

If the curve could not be taken safely at a speed in excess of 35 miles an hour (the legal limit being 60 miles an hour), the jury could conclude that the County was responsible for a lethal trap in not placing signs indicating a safe speed, or in cautioning drivers to drastically reduce speed, as well as for the failure to conform to the state's standards to which we have just referred. The jury could also have concluded that constructing the road with inadequate superelevation on the curve was negligence, or that the signs as placed, with the Mahre Road intersection so close to the curve, deceived and misled the traveling public.

Was any such negligence of the County a proximate cause of the accident? We could concede that it could not be conclusively determined that every negligent act or omission for which the County was responsible was a proximate cause of the car leaving the highway. If, for instance, the driver of the car had driven this route before and was familiar with the conditions and was just showing off his brother's hot-rod, all the signs conceivable and wherever placed would not have influenced the result one iota. The driver of the car was in the courtroom during the trial, and his familiarity with the road, or lack of it, could have been ascertained; but for reasons best known to the trial tacticians he was not called as a witness[3] by any of the plaintiffs, or by the County.

---

[3]While not relevant to this opinion, the court has considered sua sponte the validity of the view expressed by Judge Sibley in *Chalmette Petroleum Corp. v. Chalmette Oil Distributing Co.*, 143 F. (2d) 826, 829 (C.A. 5th), 1944:

". . . If neither party will risk calling a witness who knows

The only testimony from which we can draw any inferences relating to proximate cause, so far as the effect of the signs is concerned, is that of Wayne Manuel and Richard McVey both of whom were riding in the front seat with the driver. (Of the two boys riding in the back seat, one was killed and the other could remember nothing.)

Wayne Manuel, who sat beside the driver, saw the first sign (the intersection sign), but did not see the second sign (the curve sign). He testified that he told the driver "to stay to the left, since it [Tieton Drive] went straight." Wayne remembered saying, "It looks nice and straight; keep driving a ways on Tieton Drive." He said, "There might have been a little bit of discussion," but he did not remember what anybody else said.

Richard McVey testified that he had moved from Yakima to Seattle and was just back for a visit, and that he had never been over the road before at the place where the accident happened. He saw both signs. He testified that "we could see" the intersection sign (referred to as a Y sign) and, at that time, the driver slowed down to about 50 miles an hour. McVey doesn't remember who said what, but does remember a discussion about the signs and that it was agreed that the road went straight "and that the other 'deal' on the 'Y' was for the Mahre Road."

---

important facts, it is in the power of the court to call and examine such a witness, in the interest of truth and justice, allowing both parties the right of cross-examination and impeachment. We have sanctioned this in a criminal trial, and see no reason why it may not be done in a case like this if the judge, in his discretion, thinks it wise and proper. . . ."

This opinion is quoted with approval in Mr. Justice Frankfurter's dissent in *Johnson v. United States* (1948), 333 U. S. 46, 55.

Decisions upholding a trial judge's right to call witnesses also uphold the right of both parties to cross-examine. See *Litsinger v. United States*, 44 F. (2d) 45, 47 (C.C.A. 7th) 1930; 3 Wigmore, Evidence § 918 note 3.

While the power to call witnesses has generally been recognized as a valid exercise of the trial judge's discretion, appellate courts have usually taken the position that a new trial will not be granted for his failure to do so because the appellant had a prior opportunity to subpoena the witness. Wigmore, without annotation, dismisses the idea that it is a judge's duty (as distinguished from his discretionary right) to call witnesses: "That he [the judge] has no burden or duty of doing so is plain in the law." 9 Wigmore, Evidence (3d ed.) § 2484, p. 267.

"After we had agreed the road we were on went straight, I believe we speeded up to about 55 or 60 again, and before we knew it we were on the curve."

There is no direct evidence here that the driver ever saw both signs, only that McVey did; and, based on his testimony that there was discussion about the signs and that it was agreed that the road they were on went straight, it can be inferred that the driver had never been over this road before and that they were all deceived into believing that Tieton Drive went straight and that the curve sign referred to the Mahre Road intersection.

From this testimony, it can also be inferred that the signs posted did not convey an adequate warning of the situation ahead and that had there been any signs to indicate the urgent necessity to reduce speed, this accident would have been averted.

This is far from conclusive proof of proximate cause, as must always be the case where the negligence relied upon is a failure to give adequate warning; but it clearly rises above speculation and conjecture to the level where reasonable minds can conclude that more likely than not adequate warnings would have prevented the accident which caused the injuries.

It was not necessary to prove that every negligent act or omission of the County was a proximate cause of the accident; it was sufficient if any negligent act or omission was such a proximate cause.

The case properly went to the jury on the issue of whether the County's negligence was the proximate cause of the injuries sustained; and the jury, having brought in a verdict for each of the plaintiffs, must have found that such negligence was more likely than not a proximate cause of the injuries sustained by each of the plaintiffs.

The County further urges that it was entitled to a new trial because of the failure of the trial court to give certain requested instructions.

Requested instructions Nos. 18, 19, and 20 had to do with the duty of the County to post and maintain warning signs upon county roads. The requested instructions (Nos.

18 and 19) were entirely inappropriate to the facts of the present case. The County, having erected warning signs because of a dangerous condition, the issue became not whether the County was required to give a warning, but whether the warning given was adequate for the condition which existed, and also whether it was actually misleading.

Requested instruction No. 20 was not only inappropriate but inaccurate. The County, having determined that signs were necessary, was obligated by statute (see footnote 2) to conform to the requirements of the Washington State Highway Commission, which it concededly failed to do.

The County sought, by requested instruction No. 12, to apply the doctrine of volenti non fit injuria to the facts of this case. By requested instructions Nos. 16 and 17, it sought to inject the idea of joint venture into the relationship between the driver and his passenger. And, by requested instructions Nos. 31 and 32, it sought to introduce the theory of joint possession into their use of the car.

None of these concepts has the slightest relationship to the issue of the County's negligence, or whether that negligence was a proximate cause of their injuries. These requested instructions represent an effort on the part of the County to associate the passengers in the car with the driver in such a way that his negligence may be imputed to them, in the event the jury concluded that his negligence was a proximate cause of the car leaving the highway.

There was not sufficient evidence to warrant any of these instructions. The trial court properly instructed the jury that negligence on the part of the driver could not be charged to the passengers and that the care required of them was that which a reasonably careful person, riding as a passenger, would use under similar circumstances.

Finding no error, the judgment is affirmed.

ALL CONCUR.

February 4, 1965. Petition for rehearing denied.