[No. 39800.    Department Two.    June 19, 1969.]

L. D. HENYAN, *as Guardian, Appellant,* v. YAKIMA COUNTY, *Respondent.**

*Ronald F. Whitaker* (of *Walters & Whitaker*), for appellant.

*Lincoln E. Shropshire* and *Jon R. Harlan,* for respondent.

HALE, J.—Two boys had spent an aimless afternoon, doing nothing in particular until they met at the Freezer Drive-In. There, Tom Brzoska told Scott Henyan that his father's car seemed to be missing and backfiring, and they decided to drive it at high speeds to blow the carbon out of the motor. Their car failed to make the curve on Tieton Drive at the place where a remarkably similar accident occurred as reported in *Schneider v. Yakima County*, 65 Wn.2d 352, 397 P.2d 411 (1964). Charging Yakima County with the negligent failure to provide proper warning or protection against a very dangerous condition, Scott Henyan, the passenger, brought this action against Yakima County.

Driving west on Tieton Drive, and at a place just passed the Mahre Road junction where Tieton makes a sharp curve down hill to the right, the boys' car failed to make the curve, left the road, and plunged straight ahead. From changing viewpoints as the driver approaches the curve on

*Reported in 455 P.2d 937.

Tieton, he has the impression that it goes straight ahead down hill, because after the road curves down hill to the right it then turns left again near the bottom and proceeds straight west again, creating an optical illusion from some places at the top of the hill that it goes straight on down the hill. The parties agree that the map and description of the terrain and road contours reported in *Schneider, supra,* concerning the accident there in 1961, except for the road signing accurately described the place where the instant accident occurred on April 11, 1966.

Plaintiff, a passenger in the automobile, charges Yakima County with negligence in failing to erect and maintain proper warning signs at a known dangerous place, and in failure to comply with uniform standards of signing adopted by the Washington State Highway Commission. There is no doubt that, as one driving west on Tieton approaches the curve, there are changing viewpoints from which the road will seem to continue straight ahead, and during these intervals, unless warned or otherwise informed, the automobile driver may not see the impending right curve down hill.[1]

The trial court held Yakima County negligent in failing to give adequate warnings and notice of the dangerous curve and hill, but found plaintiff guilty of contributory negligence in intentionally participating in an episode of dangerous driving. Its conclusion of Yakima County's negligence was based not on failure to change the road signing after the *Schneider v. Yakima County, supra,* accident—for there had been substantial changes made—but because the county had not put up "a large arrow sign in accordance

---

[1]Finding No. 7 states, *inter alia:*

"That the curve on which this accident occurred is inherently dangerous and deceptive, not only by reason of the fact that the curve is hidden by the brow of a hill, but, to the traveler going in a westerly direction, Tieton Drive appears in the distance to continue in a straight line. The curve is also inherently dangerous and deceptive by reason of the fact that a traveler going westerly on Tieton Drive from the City of Yakima goes up and down a number of hills and each time the road continues straight, which could lead a traveler to believe that Tieton Drive is in fact a straight road at the site where the accident in the instant case occurred."

with the recognized standards contained in the Manual for Signing, or placed some other warning device upon or near this hazardous curve, it failed in its duty to exercise ordinary care and was negligent." The court concluded, however, too, that "Yakima County was not guilty of gross negligence or wanton misconduct in any of its actions or failures to act." Before us now is the solitary issue of whether the evidence was sufficient to warrant the application of the contributory negligence rule as a bar to recovery by a passenger in the automobile.

Tom Brzoska, the driver, testified that when the accident occurred, he was 17 years of age and a student at Davis High School, a member of the honor society, an Eagle Scout, played on the football team, wrestled, and was on the tennis team at Davis High. He said he was an athlete, and had good reflexes. His family, he said, owned several cars, a Mustang, a Microbus, a LeMans, and a Fiat. That day, April 11, 1966, his father had the Microbus, his mother the Ford Mustang, and the 1964 Pontiac LeMans had been left at home. He had never been in trouble, was a good student, and had his parents permission to drive the Pontiac LeMans.

Tom got out of school about 3:15, went home to put on tennis shoes, and took his racket to see if he could find someone to play tennis with. Finding no tennis players, he thought he would look up his friend, Scott Henyan. By chance, he met Scott at the Freezer Drive-In, at about 5 p.m. Scott was driving a car too, but came over to Tom's car, and Tom told him the LeMans was missing and backfiring. Scott thought that the trouble was due to an accumulation of carbon, and when Tom suggested that they take the car out on the freeway and run it a bit, Scott said that Tieton Drive was a pretty straight road and why didn't they go out there. As Tom Brzoska described it:

A. Well, I told Scott that the car wasn't running very well, it was missing, backfiring, and I felt that we should take it out on the Freeway and run it a little bit because it needed it, and Scott told me that Tieton Drive was a pretty straight road and why don't we go out there, and so we proceeded to go out Tieton Drive.

The two boys discussed further the likelihood that carbon deposits had accumulated in the motor and that it would be a good idea to run the car at high speeds to blow it out. Scott picked Tieton Drive in preference to Tom's suggestion that they drive out on the freeway.

Plaintiff Scott Henyan's version of the events substantially corroborated Tom Brzoska's. He testified that he was an Eagle Scout, was active in his church, and at the time of the accident was also 17 years old. He took his car to school that day and after school drove a girl home and on his way back saw Tom Brzoska. He testified:

A. Yes, we both went up to the Freezer where I got out of my car and I went and got a coke and got back in his car when he started to mention his car was misfiring and coughing. Q. Then did you have a conversation about where you were going—what you were going to do about it, or what was going to be done about it? A. I think we both agreed that if we took it out away from town where we could run it at a high speed, higher than town speeds, for a length of time, that this would improve the carbonation of the car, which I think—or I thought was what was wrong with it.

He said it was his idea to choose Tieton Drive. He said that the misfiring and irregularity in the LeMans motor were in his opinion due to a carbon buildup and figured that if they ran the car at high speed it would burn out the carbon, free sticky valves, and probably eliminate the malfunctions attributable to carbon buildup in the motor. He said that he had been out on Tieton Drive before and remembered once turning off at the Mahre Road intersection but did not recall seeing the curve just beyond it or of ever having traversed it.

With Tom at the wheel and young Henyan sitting in the front seat beside him, they drove out to Tieton Drive, and proceeded westerly from the edge of town accelerating at times to 90 miles per hour. Scott said he thought young Brzoska was a good driver. The value of this judgment can best be ascertained from Scott's testimony:

Q. All right, do you have some recollection of the speed of the car in the vicinity of 72nd Avenue? A. I

believe it was ninety miles an hour, or thereabouts. Q. Did you say anything to Tom, to tell him to slow down or anything at that point? A. No, I didn't. I didn't see that it was necessary at that point. I didn't see any immediate danger except that he was doing an excessive rate of speed in excess of the speed limit. There were no cars on the road, no pedestrians along side of the road, and we weren't in any dangerous area where danger could occur, I felt. Q. Had you ridden with Tom before? A. Yes, I have. Q. What kind of a driver did you believe Tom to be? A. Very safe and sane driver as far as —— well, he was safe and sane, I mean he tried to foresee any problems that might arise. He was driving defensively, would be a good phrase.

and, on cross-examination:

Q. And do I understand you to say that in your opinion, Scott Henyan, that Tom Brzoska was a safe and sane driver? A. Yes. Q. And on this particular day, he was driving safely and sanely? A. Except he was going over the speed limit, I would say he was driving safe and sane. Q. As safe as one can when driving ninety miles an hour through a congested area? A. I don't believe he was going through a congested area at ninety miles an hour. Q. Do you remember the intersection of 72nd and Tieton Drive? A. On that day? Q. Yes. A. I think I can remember it, yes. It was in this area that I can't remember anything farther than that. Q. And in that particular area and immediately prior thereto as you proceed out a way from town on Tieton Drive, there are some houses in that area, aren't there? A. There are some houses, yes. Q. And a safe and sane driver goes ninety miles an hour through those areas. A. In areas where there was danger and at the point where I think he was going ninety miles an hour, there weren't any houses or congestion.

Plaintiff admitted that they went through the 48th Street intersection where four roads meet and that there was some congestion there.

He had such consummate faith in his friend's driving skill and good judgment that not once did he protest the speed or try to keep a lookout for traffic which might be entering Tieton Drive, testifying as to this:

A. When we were going ninety miles an hour I saw no danger and I knew that Tom, if was going this fast and

did see danger, he would slow down or wherever there was a possibility of danger, he would not go this fast.

He said that, as they reached 72nd Street, they were going about 90 miles per hour; there were no cars going their direction and only one or two other cars on the road coming their way. They accelerated to 90 miles per hour several times, he said, but, in the interest of safety on approaching intersections or hills which they couldn't see over, slowed to about 60 miles per hour. He said he believed the speed limit was 60 miles per hour, but learned later it was actually 50 miles per hour.

They approached Carlson Road intersection—the next to last one before the fateful turn—at 90 miles per hour, and, seeing a car there about to enter Tieton Drive, slowed to about 60. After passing that intersection, Tom, the driver, first saw the road signs in issue here. He admitted that there were houses here and there along Tieton Drive and houses near the intersection. He said that in a stretch of approximately 5 miles, he accelerated the car to 90 miles per hour more than four times, or as he put it, many times. He accelerated to that speed, he said, at least once every mile between the time he entered Tieton Drive and passed through the Carlson Road intersection. All during this time, he said, Scott said nothing about the speed nor protested it, nor indicated that he was keeping a lookout. They slowed to about 60 miles per hour, he said, when passing through several blind intersections or in going over hills over which he could not see.

He said that, as he approached Carlson Road intersection at 90 miles per hour, he slowed down to 60 and on seeing a road sign shortly thereafter, did not accelerate to 90 again; he believed he went into the curve at Mahre Road at about 50 miles per hour.

Traveling west on Tieton Drive, Carlson Road, which the boys approached at 90 miles per hour, is about three tenths of a mile from the first traffic warning sign before the Mahre Road and curve. This is a standard highway sign called a "side road 90," and was located 758 feet from the point of the accident. Then, 140 feet beyond the side road 90

sign was a reverse turn sign with a 25 mile per hour speed advisory sign just below it. These reversed turn and 25 miles per hour speed signs were 618 feet from the point of curve where the car left the road, and the side road 90 sign 758 feet from that point. As earlier observed, at a point more than 700 feet from the curve, the terrain is such that a driver traveling west on Tieton cannot see the impending curve and might well assume from its appearance that it continues straight because as the highway curves down hill to the right the curve is not visible. As the distance to the curve reduces, however, the curve becomes visible to drivers traveling west. Thus, the court could find from the evidence that the curve was inherently deceptive and dangerous and that the county was negligent in not erecting a large arrow sign to warn of the danger that the road did not continue straight, but curved right down hill.

The court found that the boys approached Carlson Road at 90 miles per hour; Tom, the driver, saw a vehicle in the intersection and slowed to about 60 miles per hour and decelerated by engine compression only to about 50 miles per hour at the crest of the hill and about 150 feet west of the reverse turn sign. The brakes were not applied after passing Carlson Road until the car went into the curve at a speed greater than the 25 mile per hour stated in the speed advisory sign.

According to the court's findings, Tom Brzoska, the driver saw both the side road 90 sign and the reverse turn sign but did not see the 25 mile per hour speed advisory sign. The sign was there to be seen, but plaintiff neither looked out for nor saw any traffic markers or signs.

Plaintiff's principal points on appeal are that the court's finding of contributory negligence on the part of a passenger was unwarranted by the record; that he was under no duty to warn of approaching danger, nor maintain a lookout; and that, even if the driver's negligence could be imputed to the passenger when by agreement they were traveling 90 miles per hour, this would not extend to whatever driver negligence may have persisted as they decelerated

passed the warning signs—which plaintiff did not see—and into the turn.

As a general rule, the negligence of an automobile driver is not imputable to his guest passenger, and we think this a sound rule in most instances because the law contemplates that there be but one operator in control at a time. It would be a dangerous doctrine indeed to divide the authority and judgment over a vehicle's operation between the operator and his passengers. Thus, because the passenger rarely shares the driver's responsibilities, the occasions are infrequent when it can be said that the passenger shares his negligence. But infrequent or not, there are times when the driver's negligence is imputable to the passenger. *See* Blashfield, *Cyclopedia of Automobile Law and Practice* §§ 2412-2414 (Perm. ed. 1946).

In *Bauer v. Tougaw*, 128 Wash. 654, 224 P. 20 (1924), this court said, at 655:

> It is equally as well established that a passenger in an automobile may be guilty of such negligence as would cause or contribute to the collision and which would render him guilty of contributory negligence and preclude his recovery.

And we affirmed this principle in *Miller v. Treat,* 57 Wn.2d 524, 358 P.2d 143 (1960), holding, however, that, while the guest passenger's knowledge standing alone that her host driver had been drinking, did not amount to contributory negligence as a matter of law, it did raise an issue of fact to be decided by the trier of the facts. That case, of course, did not hold that the passenger's contributory negligence may never be found as a matter of law, and may be an issue of fact. It did hold that contributory negligence is subject to the same tests and standards of proof as is primary negligence.

But so markedly clear in this case was the evidence of plaintiff's contributory negligence even though he was a passenger, that we find the court's resolution of that issue sound both as a fact and as a conclusion of law. Plaintiff picked the route they would travel, intending that they would drive at great speeds and accelerate and de-

celerate up and down hill, through intersection and road junction, beyond houses and farms in a rural, suburban district where they would probably encounter approaching, cross and entering traffic. During intervals when their car attained speeds of 90 miles per hour, plaintiff did not in any way protest, object or indicate that these great speeds constituted any departure from their original plan to drive at such speeds far enough to blow the carbon from the engine.

After participating in formulating the fast driving scheme, he sat idly by as it was illegally carried out, voicing no objections at any time that the driver, five times at least in an interval of 5 miles, accelerated to 90 miles per hour and most of the time when decelerating stayed at speeds above the legal speed limit of 50 miles per hour. Despite his participation in the enterprise and his knowledge of the dangers inherent in it, he kept no lookout, saw none of the traffic signs warning of impending danger and, without protest, let the driver propel the car into a sharp turn at a rate of speed far beyond which it could be kept under control. Acting in concert as they were from the outset to drive at great and illegal speeds, the passenger as well as the driver had a duty to be on a lookout for dangerous conditions and highway warning signs and to excersie reasonable care for his own safety, too. The court properly found him contributively negligent from the beginning of the journey to its ill-fated end. *Bauer v. Tougaw, supra; Rutherford v. Deur*, 46 Wn.2d 435, 282 P.2d 281 (1955); *Bickel v. Lewis County*, 51 Wn.2d 278, 317 P.2d 532 (1957).

Affirmed.

HUNTER, C. J., HILL and NEILL, JJ., and DONWORTH, J. Pro Tem., concur.